**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**NINA JEWELL OVERBY,**

     **Plaintiff,**

**v.**                        **Civil Action No. 3:09-00853**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 4 and 5). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 13 and 14).

**I.**   <u>**Procedural History**</u>

Plaintiff, Nina Jewell Overby (hereinafter "Claimant"), applied for SSI and DIB benefits on January 2, 2008,[1] alleging disability beginning September 1, 200o due to a "strained neck and back, headaches, anxiety attacks, depression, posttraumatic stress

---

[1] According to Claimant's disability report, Claimant protectively filed for social security benefits on December 26, 2007. (Tr. at 95).

disorder, and limited use of [her] left arm and hand."[2] (Tr. at 74-77, 80-82, and 99). The DIB claim was denied initially and upon reconsideration. (Tr. at 42-46 and 47-49). Thereafter, Claimant requested an administrative hearing, which was held on September 16, 2008 before the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 15-34). By decision dated November 20, 2008, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 7-14).[3]

The ALJ's decision became the final decision of the Commissioner on May 29, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On July 27, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 8, 9, 13 and 14). The matter is, therefore, ripe for resolution.

## II.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

---

[2] Claimant also testified during the administrative hearing that she became disabled due to "problems" with her feet and legs, hemorrhoids, diverticulitis, acid reflux, and high cholesterol. (Tr. at 22).

[3] The ALJ's decision only considers Claimant's DIB claim. There is no record of Claimant's SSI claim subsequent to the application date.

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity

to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review."  20 C.F.R. § 404.1520a.  First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.   If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder.  20 C.F.R. § 404.1520a(d)(2).  Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant last met the insured status requirements of the Social Security Act on March 31, 2003. (Tr. at 12, Finding No. 1). Therefore, in order to qualify for benefits, Claimant had to establish that she was disabled on or before that date. *Stahl v. Commissioner of Social Security Administration,* 2008 WL 2565895, *4 (N.D.W.Va.), citing *Highland v. Apfel,* 149 F. 3d 873 (8th Cir. 1998).

The ALJ found that Claimant satisfied the first step of the sequential evaluation because she had not engaged in gainful activity since the date of the alleged onset of disability, September 1, 2000, through her date last insured, March 31, 2003. (Tr. at 12, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the medically determinable impairment of gastroesophageal reflux disease ("GERD"). (Tr. at 12, Finding No. 3). However, the ALJ concluded that Claimant did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months, and therefore, she did not have a severe impairment or combination of impairments. (Tr. at 12, Finding No. 4). On this basis, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14, Finding No. 5).

### III.    <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence

> but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).  The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.   **Claimant's Background**

Claimant was born in 1947 and was 61 years old at the time of her administrative hearing. (Tr. at 19). She was a high school graduate and could speak and read English. (Tr. at 20, 98). In the fifteen years preceding her alleged onset of disability, she was employed as a management plan clerk and an office clerk for two separate telephone

companies. (Tr. at 23 and 25).    Claimant retired from her position with the first telephone company in 1994, after twenty nine years of service, due to back pain.  (Tr. at 22, 100).  She worked sporadically after that time, including part-time work as a daycare helper, until September 2000 when she was diagnosed with acid reflux, diverticulitis and hemorrhoids.  (Tr. at 22).

## V.    **The Medical Record**

The Court has reviewed the record in its entirety and will briefly summarize the pertinent medical records below. However, the records which do not relate to the relevant time period of September 1, 2000 (the date of Claimant's alleged disability onset) through March 31, 2003 (the date that Claimant was last insured) are omitted from the discussion.

On April 20, 2001, Claimant was evaluated for estrogen and allergy issues by Joye A. Martin, M.D., of Huntington Internal Medicine Group (hereinafter "HIMG"). She advised Dr. Martin that she had "quit her job at a day care" and that her husband had retired and "they plan on spending more time in Myrtle Beach." (Tr. at 214).  During this visit, Claimant mentioned "some increased arthritis" and wondered if there were any over-the-counter medications that she could try.  (*Id.*).  Otherwise, she indicated that she had been "feeling well."  Her physical examination was unremarkable.  (*Id.*).

On December 21, 2001, Claimant was again evaluated by Dr. Martin for interval development of headaches and dyspepsia with associated epigastric pain. (Tr. at 211). She reported being under a lot of stress due to her son's "nasty divorce" and the "world situation;" she believed her headaches were "coming and going" and that they were "bad migraine headaches." (*Id.*)  Claimant had been given Zantac empirically, which helped

7

her gastrointestinal issues after about one week of usage. Dr. Martin concluded that Claimant's headaches were probably caused by tension versus migraine variant. She assessed Claimant with GERD and noted that Claimant's gastrointestinal complaints improved with Zantac. (*Id.*).

Claimant returned to Dr. Martin's office on June 3, 2002 for a regular follow-up. (Tr. at 210). She was evaluated by a nurse practitioner, who documented that Claimant had noted some fatigue and was watching her diet due to elevated cholesterol, but otherwise she had "no concerns." (*Id.*). She reported that she and her husband had been going back and forth to Myrtle Beach, where they had a small place on the beach.

On October 28, 2002, Claimant returned to Dr. Martin's office and saw Dr. Terrance Triplett. (Tr. at 207). She complained of chronic nausea, which sounded "like irritable bowel with intermittent constipation, diarrhea, and abdominal cramps. . ." (*Id.*). Dr. Triplett concluded that Claimant's gastrointestinal problems were related to the ingestion of certain foods. He instructed her to take Zantac regularly, as she had not been doing that, "only taking it when she gets real bad." (*Id.*).

On November 5, 2002, Claimant was evaluated at St. Mary's Medical Center for abdominal pain, nausea, and vomiting. (Tr. at 191-195). She reported a history of chronic upper gastrointestinal problems with recurrent nausea and vomiting, especially after eating foods rich in fats and carbohydrates. (Tr. at 192). She stated that she was evaluated for this problem before and that she had her gallbladder removed, but that she continued to experience these issues after eating certain types of foods. (*Id.*). An x-ray showed that Claimant had a nonspecific bowel gas pattern that could represent a

mild ileus. (Tr. at 191). Her chemistry profile was normal. (Tr. at 192). She was given medication and released to follow up with her primary care physician. (Tr. at 195).

On December 20, 2002, Claimant was evaluated at Dr. Triplett's office by a nurse practitioner, Todd Lester, for complaints of continued epigastric abdominal discomfort. (Tr. at 205-206). She reported that food sometimes helped, but that "sweets" made it worse. (Tr. at 205). Nurse Lester switched Claimant's medication from Zantac, which was "no longer helping," to AcipHex.  (*Id.*)

On January 3, 2003, Claimant followed up at Dr. Triplett's office regarding abdominal pain. (Tr. at 202-203). She was again seen by Todd Lester.  Claimant reported that she felt better when taking AcipHex, but that she still experienced breakthrough pain after eating certain types of foods. (*Id.*)  Nurse Lester noted that he had instructed Claimant not to eat foods that precipitated her symptoms, but that she found it very difficult to avoid them during the holidays. (*Id.*) She also had not lost any weight as planned. (*Id.*) Mr. Lester decided to schedule Claimant for an EGD and H pylori to rule out esophagitis and intestinal infestation as other causes of her gastrointestinal issues.  (*Id.*).

On February 24, 2003, Claimant was seen by Todd Lester as "a follow-up for her chronic dyspepsia." (Tr. at 201). Mr. Lester found that Claimant was doing well. (*Id.*) She stated that she was "doing great after being on the AcipHex." (*Id.*) Her EGD revealed no signs of Barrett's esophagitis, her H-pylori and biopsies were negative, and she denied any other changes or problems. (*Id.*). Mr. Lester discussed her mildly elevated cholesterol with her and instructed her to follow a low-fat diet and exercise. (*Id.*)

On January 28, 2008, as part of its evaluation of Claimant's applications for benefits, the SSA obtained an assessment of Claimant's physical RFC from an agency consultant, Karen Fortney.[4]  Dr. Fortney noted on the final page of the physical RFC form that the medical records in the file contained no information regarding Claimant's alleged impairments of her back, hands, or limited use of her arm and hand, and therefore, there was "insufficient evidence" of impairments. (Tr. at 305).  Dr. Fortney's assessment was affirmed on February 25, 2008 by a second agency consultant, Dr. Rabah Boukhemis.  (Tr. at 324).

On January 30, 2008, Jim Capage, Ph.D., another agency consultant, completed a psychiatric review technique form, assessing Claimant's mental impairments through her last insured date. (Tr. at 307-320). Dr. Capage noted that there was insufficient evidence that a mental impairment existed during the relevant time frame, noting that there was no evidence in the file regarding the alleged conditions of anxiety, depression, or post traumatic stress disorder. (Tr. at 307 and 319).    This psychiatric review technique was affirmed on February 23, 2008 by a second consultant, Debra Lilly, Ph.D. (Tr. at 323).[5]

## VI.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ (1) erred in finding that her alleged impairments were not severe,[6] (2) erroneously assessed her credibility, (3) failed to develop the

---

[4] Dr. Fortney is presumably a physician, as she was identified as a medical consultant and completed a physical RFC form.  (Tr. at 305).  However, her credentials are not verified in the transcript.

[5] This form contains a typographical error.  Dr. Lilly obviously meant the PRTF completed on 1/30/08.

[6] Claimant's brief does not state this as an independent argument, but for the purpose of clarity, the Court treats it as such in the discussion.

10

evidence regarding her anxiety and pain, (4) failed to consider her impairments in combination, and (5) improperly rejected the opinion of her treating physicians. (Pl.'s Br. at 12-19).

Conversely, the Commissioner contends that (1) substantial evidence supports the ALJ's determination that Claimant did not have a severe impairment during the relevant time period, (2) the ALJ properly evaluated the opinions of Claimant's treating physicians, (3) substantial evidence supports the ALJ's credibility determination, (4) there was no need for the ALJ to further develop  the medical evidence regarding Claimant's alleged anxiety and pain, and (5) the ALJ properly evaluated Claimant's alleged combination of impairments. (Def.'s Br. at 8-19).

## VI.   <u>Discussion</u>

### A.   **Severity Finding**

Claimant argues that the ALJ had "no basis" for his finding that Claimant conditions were not severe. (Pl.'s Br. at 13). Specifically, she asserts that the ALJ erred in finding that her alleged chronic headaches and anxiety were not severe. (*Id.*)

As stated in the decision and previously in this discussion, the ALJ is required to determine whether a claimant suffers from a severe impairment at the second step of the sequential evaluation.  20 C.F.R. § 404.1520(c). A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).[7]  Pursuant to Social Security Ruling (SSR) 85-

---

[7] Examples of "basic work activities" are (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of

28, an impairment is not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28.  An impairment found not to be severe does not prevent an individual from engaging in basic work activities "even if an individual were of advanced age, had minimal education, and a limited work experience." *Id.*

In the present case, at the second step of his analysis, the ALJ considered Claimant's alleged disabilities of posttraumatic stress disorder and neck pain, finding that there was "no evidence of treatment for either neck pain or complaints of symptoms related to post-traumatic stress disorder prior to the date she was last insured for benefits." (Tr. at 13). The ALJ next considered Claimant's gastroesophageal reflux disease, noting that while Claimant received treatment for that condition during the time period relevant to the decision, there was no evidence to indicate that the severity of the condition resulted in a significant limitation of work-related function. *Id.*

The ALJ correctly recognized that the medical evidence contained no references to neck pain or posttraumatic stress disorder during the relevant time frame. Moreover, substantial evidence supports the ALJ's finding that Claimant's gastroesophageal reflux disease ("GERD"), while present, was not a severe impairment. Dr. Triplett and Nurse Lester observed that Claimant triggered her gastrointestinal symptoms by ingesting "certain types of [unhealthy] foods."  They repeatedly instructed her to stop eating those types of foods, to take her Zantac and regularly, and to lose weight, directives that

judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

Claimant seemingly ignored. (Tr. at 195, 205, 207, 202).   Certainly, if Claimant's reflux disease caused disabling symptoms, she would not have knowingly elicited them by her eating habits and she would have religiously followed the instructions of her health care providers.   In any event, the record substantiates that Claimant was successfully treated for her GERD with the medication AcipHex. (Tr. at 201).

Although the ALJ failed to expressly address Claimant's other alleged impairments, such as headaches and anxiety, when making his severity determination, the Court finds that this was not in error, because the medical records created during the relevant time frame do not establish these conditions as medically determinable impairments expected to last for a *continuous* period of twelve or more months. The record is absent of any references to chronic neck or back pain, depression, or posttraumatic stress disorder prior to March 31, 2003.

In addition, other than isolated references to arthritis, headaches, and anxiety, the record is devoid of any objective medical evidence substantiating the existence of these conditions. Regarding Claimant's allegation of arthritis, she contends that she has limited use of her left arm and hand.  The record establishes that on April 20, 2001, Claimant reported to her physician that she was experiencing "some increased arthritis" and inquired about over-the-counter medications that might help relieve the symptoms. (Tr. at 214).  While this complaint may have foreshadowed her subsequent difficulties, there simply is no evidentiary support upon which to conclude that Claimant's arthritis constituted a severe impairment during the time period at issue.

Similarly, on December 21, 2001, Claimant reported that she had headaches which were "coming and going," and Dr. Martin stated that were "probable tension

versus migraine variant." (Tr. at 211). Claimant mentioned being under stress and being upset due to her son's "nasty divorce" and the "world situation," suggesting that the headaches were directly connected to current events in Claimant's life.  Dr. Martin did not undertake to formally evaluate Claimant's headaches, and Claimant did not mention them again before her last insured date.  She did tell Dr. Martin at the time of the office visit that a CT scan taken of her head was negative.  (*Id.*)

Regarding Claimant's alleged disability of anxiety, it is important to note than none of the physician entries in the relevant medical records contain a formal diagnosis or assessment of anxiety disorder. (*Id.*)  On a few occasions, it was noted in Claimant's chart that she had a prescription for Xanax to be taken *pro re nata* (Tr. at 207 and 210). While it is true that Claimant took Xanax for anxiety, she documented that the medication was prescribed to her in 1987 after her hysterectomy and she took it "as needed" and "occasionally" thereafter.  (Tr. at 111).  Clearly, Claimant had worked for many years while taking Xanax, without apparent side effects or documented episodes of anxiety attacks. Complaints of increased anxiety or related functional limitations were not raised by Claimant at any point during the relevant time period.

As indicated above, the record provides no support that Claimant's alleged limited use of her left arm and hand, headaches, or anxiety were severe impairments prior to March 31, 2003.[8] Therefore, the Court finds that the ALJ's failure to discuss these conditions in making his severity finding at the second step of his analysis was harmless error. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle

---

[8] Because the ALJ did not find Claimant's alleged mental impairments to be medically determinable, application of the "special technique" terminated at the first step and an evaluation of the attendant functional limitations was not required.   20 C.F.R. § 404.1520a.

of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, *1 (4th Cir. 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, *1 (4th Cir. 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, *1 (4th Cir. 1996).

The Court finds that the ALJ properly articulated and applied the Social Security Act in making a severity finding and that his resulting determination is supported by substantial evidence.

### B.  Credibility Assessment

Claimant next argues that the ALJ "erroneously assessed [her] credibility in this matter and substituted his opinion for that of the credible treating physicians." (Pl.'s Br. at 14).   In the decision, the ALJ correctly stated his obligation to apply a two-step process in assessing Claimant's symptoms to determine the severity of her impairments. (Tr. at 13).  This two-step process required the ALJ to first identify the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms about which Claimant complained.  Once the ALJ found the existence of such a medically determinable impairment, he was required to evaluate the intensity, persistence, and functional limitations caused by the impairment. SSR 96-7p.  When a claimant's statements about intensity, persistence or functional limitations are not substantiated by objective medical evidence, the ALJ must make a credibility determination. *Id.*  A credibility determination is an assessment of the degree to which the claimant's statements "can be believed and accepted as true." *Id.*  This assessment is made by considering the entire case record and cannot be based on an intangible or

intuitive notion about an individual's credibility. *Id.* The ALJ must evaluate the medical signs and findings; the diagnosis and prognosis; the medical opinions; statements and reports from the claimant, claimant's physicians, or other persons with knowledge of the claimant's history, symptoms, treatment, response to treatment, work record and daily activities; observations by SSA employees who interviewed the claimant; and the ALJ's own observations made during the administrative hearing. *Id.* When the ALJ made a credibility determination, he was obligated to document the reasons for his findings in a manner sufficiently specific to allow subsequent reviewers to understand the weight given to the claimant's statements and the reasons for that weight. *Id.*

As stated, the ALJ found the existence of a medically determinable impairment (GERD) that could reasonably be expected to produce Claimant's pain and other symptoms; thus, he assessed Claimant's credibility. However, the ALJ concluded that Claimant's statements as to the intensity, persistence, and limiting effects of her alleged disabilities, separately and in combination, were not credible, because they were inconsistent with the pertinent records in evidence, stating as follows:

> [Claimant] testified that she stopped working in 1994 because of low back pain and problems with her nerves. She stated she was on medications for these problems. The record, however, contains no evidence of treatment for either complaint prior to 2005.
>
> The claimant's treating physician opined on December 26, 2007 and September 12, 2008 that the claimant is disabled (Exhibits 18F and 19F). These opinions were, however, rendered over four years after the claimant's insured status expired. As there were no treatment records indicating treatment for back or neck pain or complaints of a nervous condition prior to March 31, 2003, the date the claimant was last insured for benefits, the treating physician's opinions are not consistent with the overall record.

As is clear from the ALJ's finding, the ALJ did not reject Claimant's statements or her treating physician's opinions because they conflicted with other evidence concerning the same temporal period. Rather, the ALJ rejected the statements and opinions because *they did not relate to the relevant time period.* In this case, the ALJ may have found Claimant's complaints and her physician's opinions to be valid as they related to her condition in 2005 and thereafter. However, the ALJ properly found that these complaints and opinions were not credible in relation to the relevant time period. There is no indication whatsoever in the record that the 2007 and 2008 opinions of Claimant's treating physician, nor the majority of Claimant's complaints, reflect her condition as it existed from September 1, 2000 through March 31, 2003. In fact, the record clearly substantiates that Claimant did not suffer from any severe impairments during that time period. The Court finds that the ALJ's credibility determination is supported by substantial evidence and that Claimant's argument is without merit.

### C.    Duty to Develop the Evidence

Claimant also contends that the ALJ failed to develop the medical evidence regarding Claimant's alleged anxiety and pain. (Pl.'s Br. at 14).  In *Cook v. Heckler*, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence," stating "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  However, the ALJ's duty to fully and fairly develop the record did not require him or her to act as plaintiff's counsel.  *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).  The ALJ had the right to assume that

17

Claimant's counsel was presenting Claimant's strongest case for benefits.  *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987).  Moreover, the ALJ's duty to develop the record did not mandate that he obtain additional documentation or make specific inquiries "as long as the record contain[ed] sufficient evidence for the administrative law judge to make an informed decision."   *Ingram v. Commissioner of Social security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.).   When considering the adequacy of the record, the Court must look for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant.  *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. Instead, remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.  *Id.*

Equally as important is the principle that the Claimant bears the burden of establishing a *prima facie* entitlement to benefits.  *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  To meet this burden, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment.  *Id.* § 404.1512(c).  In *Bowen v. Yuckert*, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.

18

> The claimant first must bear the burden. of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

*Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The Court finds that the administrative record concerning Claimant's alleged anxiety and pain was not incomplete or inadequate such as to require the ALJ to further develop the record. The medical evidence clearly indicates that Claimant's symptoms of anxiety were well-controlled during the relevant time period. Years prior to her alleged disability onset date, Claimant was prescribed Xanax, which evidently worked well as she did not mention any issues related to anxiety during her numerous documented visits with her treating physicians, other than one mention of situational stress that resulted in headaches. (Tr. at 211). Furthermore, the ALJ questioned Claimant during the administrative hearing about her psychiatric treatment, specifically asking her if any health care provider had recommended that she participate in counseling. Claimant responded, "[i]t was recommended just in the last few years," well after the date on which she was last insured. (Tr. at 26). The ALJ also inquired how often she had panic attacks during the relevant time period, how long they would last, and what happened during them. (Tr. at 27). Claimant's attorney then thoroughly questioned Claimant about her panic attacks. (Tr. at 28-30). Consequently, there were no gaps in the evidence, unresolved questions, or any other facts which would have prompted the ALJ to further develop the record as to Claimant's alleged anxiety. The record was complete on this matter.

Similarly, the record was complete regarding Claimant's alleged pain. Claimant's medical records discuss Claimant's epigastric pain. (Tr. at 211, 192, 205, and 202). The records clearly document the treatment of such pain and its diminishment and stabilization with medication.  On February 24, 2003, shortly before Claimant's date last insured, Dr. Triplett noted that Claimant was "doing great after being on AcipHex," and that her battery of tests showed no problems. (Tr. at 201). Further, Claimant's attorney questioned her extensively about her pain during the administrative hearing. (Tr. at 30-31). Therefore, it was not necessary for the ALJ to further develop the record as to Claimant's pain.

Accordingly, the Court finds that the ALJ fulfilled his duty to develop the record and the record did not demonstrate evidentiary gaps that would create prejudice to Claimant.

### D.     Combination of Impairments

Claimant asserts that the ALJ failed to properly evaluate Claimant's impairments in combination. (Pl.'s Br. at 16). Again, Claimant generally supports this argument with references to medical records, such as the opinions of Dr. Bal Bansal, which significantly post-date the insured period.  Dr. Bansal, a treating physician of Claimant, provided opinions in December 2007 and September 2008 that Claimant was disabled due to post-traumatic stress; headaches; soft tissue damage to lower back; and cervical disc herniation. (Tr. at 338-342). However, Claimant must prove that a disabling impairment or combination of impairments existed between *September 2000 and March 31, 2003*; otherwise, her application must be denied. Notably, Claimant's medical records from the applicable period do not support her allegations of disability.

20

Proof that a disabling impairment was present in 2007 or 2008 simply is not proof of a disability in 2003.

Claimant also mistakenly insists that the ALJ should have compared the combination of her impairments to the criteria of a listing before terminating his evaluation.   The ALJ properly concluded his assessment at the second step of the sequential evaluation, because Claimant did not have any severe impairment(s), which could be compared to the listed impairments. The only concern here is whether the ALJ considered Claimant's impairments in combination at the second step of his analysis; that is, whether the ALJ considered whether Claimant had a combination of impairments that were severe. 20 C.F.R. 404.1520(c). The Court finds that the ALJ fulfilled his obligation to perform this analysis. He considered Claimant's alleged impairments of posttraumatic stress disorder, neck pain, and gastroesophageal reflux disease, stating that he considered her impairments in combination. (Tr. at 12, 13, and 14). As noted, although he did not discuss her other alleged impairments, such impairments were not supported by the record and appropriately not discussed. To the extent that the ALJ could have elaborated on his analysis of Claimant's impairments in combination, the Court views this as harmless error. The medical record irrefutably indicates that Claimant's health status was relatively uneventful during the insured period with the exception of epigastric complaints that were controlled with diet and medication. The record lacks objective medical evidence that the combination of Claimant's alleged impairments were severe. Therefore, the decision of the ALJ is supported by substantial evidence.

### E.   Treating Physicians Opinions

Claimant's final assertion of error is that the ALJ wrongfully disregarded the opinions of Dr. Triplett and Dr. Bansal in favor of his own unqualified opinions and the opinions rendered by the State's consultative sources. (Pl.'s Br. at 17-19).   In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.   *See* 20 C.F.R. § 404.1527(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.   *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   The Court need only review the record as a whole and corroborate that the Commissioner's conclusions are rational and based upon substantial evidence.

The ALJ confirms in his decision that he rejected Dr. Bansal's 2007 and 2008 opinions because they were rendered well after Claimant's insured status had expired and supplied no indication that they related back to the relevant time period. (*See* Tr. at 339 and 342). As the ALJ explained, Dr. Bansal's opinions were "rendered over years after the claimant's insured status expired" and were inconsistent with Claimant's

medical records from the relevant time period.  On the other hand, the opinions of the agency experts, Karen Fortney, Dr. Capage, Dr. Lilly, and Dr. Boukhemis, all explicitly indicated that they related only to the relevant time period. (Tr. at 305, 307, 323, and 324). Therefore, it was appropriate for the ALJ to afford little weight to Dr. Bansal's opinions and to rely instead on the opinions of the agency consultants.  The ALJ fully complied with 20 C.F.R. § 404.1527(d)(2) in making this finding and affording "little weight" to Dr. Bansal's assessment.

Further, there is no indication that the ALJ did not afford controlling weight to the records of Dr. Triplett. Claimant points to no particular portion of the ALJ's decision that is inconsistent with or rejects Dr. Triplett's medical opinions.  A review of the record establishes that Dr. Triplett did not provide any opinions related to Claimant's functional limitations, severity of impairment, or ability to work during the pertinent time frame.  In addition, the records created by his colleague, Dr. Joye Martin, suggest that the Claimant's health was stable and that she decided to quit working altogether, not because of severe physical impairments, but in order to spend more time with her recently retired husband at their beach house in Myrtle Beach.  Accordingly, this argument is without merit.

The Court finds that the ALJ's treatment of Claimant's treating sources is supported by substantial evidence.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment

Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  January 18, 2011.

Cheryl A.  Eifert
United States Magistrate Judge